no larceny without a felonious intent. This portion of the quoted charge was excepted to, and was in no wise corrected, modified, or explained. We think that, as it was delivered in the body of the charge, its certain tendency was to lead the mind of the jury to the conclusion that they were authorized to find the defendant guilty if they found that the loser described her pocketbook, and the defendant refused to surrender it. The subsequent charge that there must have been the felonious intent was disconnected from the context of the charge, and amounted to no more than a correct statement of an abstract proposition of law, and did not cure that portion of the charge to which an exception was taken.

The judgment should be reversed, and a new trial granted. All concur.

(18 App. Div. 579.)

### LAMB v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1897.)

1. ACCIDENT AT RAILROAD CROSSING—CONTRIBUTORY NEGLIGENCE.

　　Decedent, in the nighttime, was delayed at a crossing by a freight train, during which time no flagman nor gateman was seen. When the freight train moved east, defendant crossed the track, and went onto another track, and was killed by an express train coming from the west, the view of which was in no way obstructed after the freight train had moved from the crossing. Held, that he was guilty of contributory negligence.

2. SAME—FAILURE TO EMPLOY WATCHMAN.

　　Where the evidence disclosed that decedent was killed at a railroad crossing, about midnight, and that he had ample means of knowing that no watchman was there, it is error to allow the jury to consider the omission of the railroad company to maintain the gates with a watchman at the crossing at night.

Appeal from trial term.

Action by Anthony Lamb, as administrator of William C. Easley, against the New York Central & Hudson River Railroad Company. From judgment for plaintiff, and an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Frank Hiscock, for appellant.
John W. Hogan, for respondent.

FOLLETT, J. This action was begun January 25, 1895, to recover damages under section 1902 of the Code of Civil Procedure for the alleged negligent killing of the plaintiff's intestate. The decedent was 26 years old, and a resident of the state of Texas, having a wife and one child. He left his family October 9, 1892, and was not heard of afterwards by them until after he was killed. It appears that he went almost immediately to the La Concha, an apartment and Turkish bath house in the city of Syracuse, where he stayed under the assumed name of Louis W. Lee. After 9 o'clock of the night of the accident —February 3, 1895—he left this house in an open cutter, drawn by one horse, with two young women, who were employés or inmates of the establishment. He drove westerly on the Baldwinsville highway,

crossing the railroad at a place where the accident subsequently occur-red, and stopped at a road house, where he drank with his companions two or three times; and one of them becoming ill, was left at the house, and the decedent with the other started, after 11 o'clock, to return to the city of Syracuse by the same road by which they left the city. The accident occurred at the crossing, which will now be described. The four tracks of the defendant cross this highway, and are numbered 1, 2, 3, and 4; No. 1 being the south track, and No. 4 the north track. The distance from the north rail of track 4 to the south rail of track 1 is about 85 feet. North of the four main tracks, and west of the highway, is a side track branching from track 4, but it does not cross nor extend eastward of the highway. North of the defendant's tracks are the two tracks of the West Shore Railway, which also cross this highway; the south rail of the south track of the West Shore Railway being about 75 feet north of the north rail of defendant's north track, No. 4. The tracks of these railroads are on embankments raised from 8 to 12 feet above the natural surface of the ground, and travelers on the highway approaching the crossing have an uninterrupted view of the tracks of both roads for several hundred feet east and west, except as interrupted by trains or cars standing or passing on the tracks. At the crossing over defendant's tracks are gates which during the daytime are lowered and closed by a watchman on the approach of trains, but during the night they are raised and fastened open, and they were open when the decedent and his companions crossed the tracks shortly after 9 o'clock of the night of the collision. At the time of the accident 8 or 10 cars stood on the side track west of the highway. Near midnight—the wit-nesses do not quite agree as to the hour—the decedent, accompanied by one of the women, and riding in a cutter, approached this crossing from the north. They crossed the tracks of the West Shore Railway, and as they reached the north track (No. 4) of defendant's road, they found the crossing obstructed by an east-bound freight train standing on track 4, which had stopped to cool a heated journal. The decedent and his companion were delayed by this freight train from 30 to 45 minutes. How far north of the train the horse and cutter stopped does not exactly appear, but near enough to it so that the employés thereon and the decedent engaged in conversation. When the heated journal had been cooled, and the damages repaired, the freight train started eastward, and as it passed over the highway the decedent drove onward, south, and collided with the Cincinnati Express, No. 12, running east at the rate of 40 to 45 miles per hour on defendant's south —No. 1— track, and was killed.

It is alleged in the complaint that the defendant was guilty of negli-gence in the following respects: (1) That the train was running "over forty miles per hour"; (2) that decedent's view of defendant's tracks west of the highway was interrupted by cars; (3) that the gates erected at the crossing were not closed; (4) that the flagman was not on duty at the crossing at the time of the accident; (5) that no signal by bell or by whistle was given of the approach of the Cin-cinnati Express. The rate of speed of this express passenger train was not unusual or excessive, and it was not negligent to run at that

rate of speed in the open country. Before decedent started his horse, the freight train started east, and it could not have obstructed his view to the west, and the evidence shows that decedent's view of defendant's tracks west of the highway was not interrupted by the 8 or 10 cars standing on the side track, for they must have been northwest of the place where he stopped his horse, and stood from half to three-quarters of an hour. The decedent knew from his observation during his enforced stay at this crossing, and also from having previously crossed at this place a few hours before, that the gates were not operated, or a flagman on duty during the nighttime. Whether the bell was rung and the whistle sounded was hardly an issue of fact upon the testimony. The only witness who testified in behalf of the plaintiff on this question was the companion of the decedent, who said on her direct examination that she heard no signal by bell or whistle, and that all she heard was the sound of the freight train passing eastward. This witness, before the trial, had made a written statement of the occurrences at the time of the accident, in which she said:

"The headlight was lighted. I can't say whether the bell was rung or not, or whether the whistle was blown. All I can say is I did not hear them; did not hear either; that is all I can say with reference to them. I don't remember looking to the westward or to the right before we were struck. I did not see Easley look that way while we stood there or before we were struck. I was so anxious to get home that I did not think of anything except getting across."

The examination and cross-examination of this witness, read in connection with this statement, is to the effect that she could not tell whether the bell was rung or the whistle sounded. The engineer and fireman on the Cincinnati Express testified that the whistle was sounded about 2,000 feet west of the crossing, and that the bell was rung when the train approached and crossed the highway. A brakeman employed on the freight train testified that he heard the whistle and bell on the Cincinnati Express, and that he notified the decedent and his companion that the express was coming. The woman denied that they were notified of the approach of that train. The woman testified that the headlight on the locomotive was burning. It seems to me that the plaintiff failed to show that the decedent was free from negligence which contributed to the accident, and more, that the evidence shows that he did not exercise ordinary care in attempting to cross the tracks. Again, the learned trial judge, in submitting the case to the jury, instructed them, as bearing upon the contributory negligence of the decedent, that they might take into consideration the fact that during the daytime this crossing was protected by a watchman, whose duty it was to operate the gates, but during the nighttime it was not so protected. In this connection it was charged:

"In this regard, gentlemen, as to whether the decedent exercised reasonable care and prudence for his own safety while approaching and passing over this crossing, you have a right to consider the fact that gates were operated there during the day, and a flagman stationed there during the day, and at night both of these methods of warning were taken away; and you are to consider what effect, if any, those facts—the fact of the stationing of a flagman there during the day, and the fact of the gates being operated during the day—had upon the mind of this decedent in inducing him to rely upon the idea that they were there upon the night in question. Was he thereby, by the act of the defendant, deceived into reliance upon their being present on the night in ques-

tion? And was he thereby induced to lessen the vigilance which he otherwise would have exercised in looking up and down the track for the purpose of discovering any approaching train? Was he, under the circumstances, induced by the nonappearance of the flagman, and by the gates being raised, to believe that there was no danger to be apprehended, and that the track was clear?"

To this instruction the defendant excepted. The evidence did not justify the submission of this question to the jury. It was shown, and not disputed, that it had been the custom for some time to keep a flagman at this crossing, and operate the gates during the daytime, but never during the nighttime. It is also an undisputed fact that the decedent and his companions drove over this crossing on the night in question during their outward trip from the city, and that when they crossed the gates were not operated, and that no flagman was there. The evidence given in behalf of the plaintiff is that for at least a half hour preceding the accident the decedent and one of his companions had been detained at this crossing, and he had ample opportunity for knowing that a flagman was not there, and that the gates were not operated. He could not have been lulled into security by the fact that gates were there, which were then fastened in an upright position. It was error to submit this question to the jury as bearing upon the issue of the contributory negligence of the decedent.

The judgment and order should be reversed, and a new trial granted, with costs to abide the event. All concur.

WARD, J. I concur upon the question that it was error in the trial court to allow the jury to consider the omission of the defendant to maintain the gates with a watchman at the crossing at night the same as in the daytime upon the question of contributory negligence.